**STANDARD PACKAGING CORPORA-TION, Plaintiff,**

v.

**CURWOOD, INC., Defendant.**

**No. 72 C 3003.**

United States District Court,
N. D. Illinois, E. D.

Oct. 18, 1973.

Silverman & Cass, Chicago, Ill., Amster & Rothstein, New York City, for plaintiff.

Donald Sell, St. Paul, Minn., for witness Litman.

Henry Tarring, Washington, D. C., for patent office.

Mann, Brown, McWilliams & Bradway, Chicago, Ill., for defendant.

MEMORANDUM OPINION
AND ORDER

AUSTIN, District Judge.

This matter comes before me on Defendant's motion for an order compelling answers to questions posed to a former

patent examiner, Mark Litman, during his deposition earlier this year. Litman represented the United States Patent Office in the examination and approval of the patent under scrutiny in this infringement action. The fourteen certified questions at issue relate to Litman's official actions in his capacity as examiner of this patent.

Defendant argues that Litman's answers are relevant to the contentions that the invention claimed was "obvious" to those skilled in the art at the time that the invention was made and that, therefore, the patent is not valid and not entitled to protection under federal law. See Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) and 35 U.S.C. § 103. Plaintiff does not dispute the relevancy of Litman's testimony to the "obviousness" issue but rather maintains that a former examiner may not be questioned as to the mental processes employed in reviewing and approving a patent. Plaintiff contends that all of these questions violate the so-called "mental processes" rule. See Lupo, The Impact of Mayewsky, 55 J.P.O.S. 216 (1973). The Commissioner of Patents has filed an *amicus* brief supporting and expanding upon Plaintiff's position.

Although this Court does not disagree with Plaintiff's statement of law, the application of the relevant principles to the present questions dictates a finding substantially in favor of Defendant. The facts underlying this action have been discussed in previous opinions in this case and need no repetition here.

## I.

Generally, all individuals are subject to the lawful authority of a competent court to compel testimony of any facts within their knowledge and relevant to the issues at hand. See Blair v. United States, 250 U.S. 273, 279–283, 39 S.Ct. 468, 63 L.Ed. 979 (1918); 98 C.J. S. Witnesses § 430, nn. 9–19. An exemption from compulsory testimony is recognized in certain situations to pro-

tect the integrity and individual responsibility of governmental officials whose duties involve the exercise of judicial and quasi-judicial authority. See the *Morgan* decisions, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1935), 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), and 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). See also Fayerweather v. Ritch, 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904) and Chicago, B. & Q. Ry. Co. v. Babcock, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636 (1906).

To allow certain exemptions to these officers is not to provide them with a blanket immunity from testimony. Like any testimonial "privilege," this one must be construed and applied with the greatest care for fear that it be misused or abused. And, indeed, the courts have been most scrupulous in delineating between protected and unprotected testimony on a case-by-case basis. In various instances and circumstances, judges, jurors, justices of the peace, and referees have been compelled to testify. See Downey v. United States, 67 App.D. C. 192, 91 F.2d 223 (1937); Gore v. State, 22 Ala.App. 136, 114 So. 791, cert. den. Ex parte State ex rel. Attorney General, 217 Ala. 68, 114 So. 794 (1927); Hundley v. Commonwealth, 193 Va. 449, 69 S.E.2d 336 (1952); Beck v. Kulesza, 4 W.W.Harr. 559, 156 A. 346 (Del.1926).

The essential line of demarcation appearing from the cases is that judicial and quasi-judicial officers may be compelled to testify only as to relevant matters of fact that do not probe into or compromise the mental processes employed in formulating the judgment in question. See the *Morgan* decisions, *supra*. Thus, even though a particular inquiry may be factually directed, it may still be objectionable if it invades upon an official's good-faith decision-making prerogatives. It is apparent, however, that this doctrine does not exempt compulsory testimony as to all factual matters related to those prerogatives.

## II.

■ Reviewing the cases, it is unquestionable that patent examiners perform quasi-judicial duties that merit the protection of the "mental processes" rule. See Butterworth v. United States, 112 U.S. 50, 5 S.Ct. 25, 28 L.Ed. 656 (1884); United States v. American Bell Telephone Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888). The examiner's primary functions are to analyze applications for Letters Patent pursuant to the statutory requirements and to render an opinion as to the patentability of the subject matter of the application. In doing so, the examiner—much in the same manner as a judge—sifts through and evaluates the relevant data, determines and applies the pertinent rules, and reaches a final judgment. Manifestly, any inquiry that would invade the quasi-judicial features of the examiner's duties would impair his latitude in fully and fairly deciding the matters before him.

Several recent cases have considered this issue and have concluded in a like fashion. In re Mayewsky, 162 U.S.P.Q. 86 (E.D.Va.1969); Shaffer Tool Works v. Joy Manufacturing Co., 167 U.S.P.Q. 170 (S.D.Tex.1970); Monsanto Co. v. Dawson Chemical Company, 176 U.S.P.Q. 349 (E.D.Va.1972). In each case, testimony was sought by a private party litigant involved in a civil action based upon a patent handled by the examiner while it was an application in the Patent Office. In each case, the examiner was compelled to testify as to factual matters. In *Mayewsky*, the Court refused to quash a deposition subpoena served on a patent examiner and specifically held:

> that the subject matter of the deposition be restricted to relevant matters of fact and that the deposition avoid any hypothetical or speculative questions or conclusions based thereon.

162 U.S.P.Q. at 89. *Shaffer Tool Works* also ordered mandatory testimony of an examiner with the *caveat*:

> that the scope of the oral depositions of the patent examiners is hereby limited to matters of fact and must not go into hypothetical or speculative areas or the bases, reasons, mental processes, analyses, or conclusions of the patent examiners in acting upon the patent applications maturing into the patent challenged herein.

167 U.S.P.Q. at 171. Without expanding upon precedent, the *Monsanto* Court approved and accepted the prior holdings in the *Mayewsky* and *Shaffer Tool Works* decisions. See also American Cyanamid Co. v. Federal Trade Commission, 363 F.2d 757 (6th Cir. 1966), on subsequent appeal Charles Pfizer & Co. v. Federal Trade Commission, 401 F.2d 574 (6th Cir. 1968); Skil Corporation v. Lucerne Products, Inc., 178 U.S.P.Q. 562 (N.D.Ill.1973). Additionally, no court has held itself bound by the Patent Office's internal policy barring examiner testimony. See OG. 762 (United States Patent Office, 1972) and W. R. Grace v. Park Manufacturing, 70–131–D (N.D. Ill., trial transcript at 1007–25). Although that policy statement reflects the views of the Patent Office, it simply cannot create an absolute privilege where none exists.

In short, patent examiners are quasi-judicial officials and must receive the testimonial protections inherent to such positions. Accordingly, they are subject to compulsory testimony only on matters that are factual and that do not invade upon their decision-making mental processes. See Lupo, The Impact of Mayewsky, 55 J.P.O.S. 216, 227 (1973). In view of these principles, eight of the fourteen contested questions must be answered.

■ Questions 1, 2, 8, 9, 10, 11, 12, and 14,[1] set forth in the appendix, seek to determine the prior art knowledge of the

1. See Appendix 1

Patent Office at the time of issuance and the facts upon which the examiner's decision was based. These inquiries are relevant to the issue of "obviousness" as construed in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Moreover, the information received from these questions—if, in fact, Litman is able to formulate responsive answers at this late date—will greatly assist this Court in determining the various issues that arise in an infringement suit. See *Graham, supra.*

In each instance, factual responses are requested. Questions 1 and 12 are directed to the Patent Office's prior art knowledge at the time of issuance. The other six questions seek to determine the factual basis for the approval of the patent. Surely none of these inquiries probe the examiner's "mental processes."

Plaintiff objects on the grounds that these questions seek to pinpoint a particular step in Litman's reasoning. If this objection were sustained, no question could be properly framed and proffered to judicial or quasi-judicial officers. As presently stated, these inquiries seek facts and only facts. They do not infringe upon or even probe into Litman's analyses or beliefs related to this patent. However, several of these questions—particularly 2, 8, 9, 11, and 14—approach violation of the "mental processes" rule. It is possible, and, indeed, probable, that subsequent inquiries in these areas will run afoul of the stated rule. Accordingly defense counsel is cautioned in this regard.

· Questions 3, 4, 5, 6, 7, and 13,[2] are directed to Litman's personal analyses and mental processes involved in his ultimate official action. As such, they need not be answered.

Defendant argues that these inquiries are proper since they are directed to factual issues. There is no doubt that these questions can be characterized as factual at base. Assuming *arguendo*

that they are, however, even factual questions must be disallowed if they cross the fine line protecting the examiner's mental processes. These questions go well beyond that boundary in their attempt to determine Litman's beliefs, analyses, and understandings. This cannot be permitted.

Additional reasons exist for rejecting Questions 7 and 13. Question 7 is more a rhetorical statement than a proper deposition question. Moreover, it is speculative and has no foundation in the record. Question 13 presents Litman with a hypothetical set of facts and requests a quasi-judicial determination. This is the very type of question that the "mental processes" rule is designed to disallow. It need not be answered.

### III.

Judgment on Defendant's motion for an order compelling answers to questions posed to Mark Litman is entered in accordance with this opinion.

So ordered.

### APPENDIX 1

Question 1: Were you looking for any particular process in particular in that further searching?

Question 2: Did you rely on the statements which I have quoted from the appeal brief when subsequently allowing the application?

Question 8: Mr. Litman, in allowing the Coyle et al. application did you rely upon the statement made in the appeal brief?

Question 9: At the time you allowed the application, did you rely upon the statement in the appeal brief about the unobvious or unexpected, or unpredictable nature of depositing a nylon of higher melting point on a polyethylene substrate film of lower melting point?

2. See Appendix 2

138

Question 10: Mr. Litman, when you allowed the Coyle et al. application for patent, on what facts did you rely?

Question 11: Mr. Litman, was there some particular controlling fact which you recall and which was represented to you when you allowed the Coyle et al. application for patent?

Question 12: Did the recitation of the corona discharge treatment, primers, saran layers or any other features in the Coyle et al. application provide a primer [primary] basis for the allowance of the Coyle et al. application?

Question 14: Was there a controlling factor in the representations made in the appeal brief with respect to your allowance of the Coyle et al. application for patent? All I want is a yes or no.

## APPENDIX 2

Question 3: Did you have any belief as to the unexpected nature of the invention at that time [time of allowance]?

Question 4: Did you, at the time of allowance of the application, have a belief as to the unobvious nature of the invention?

Question 5: At the time you allowed the application, did you have any belief as to the predictability of extrusion coating nylon on polyethylene film?

Question 6: Can you tell us your understanding as to why the melting point of polyethylene has anything to do with the application?

Question 7: Did you know at the time you allowed the Coyle et al. application for patent that melting points of extruded material didn't have anything to do with the problem of extruding resin in polyethylene film?

Question 13: Would you have allowed the Coyle et al. application for patent if you had known of the prior commercial practice of using polyethylene as an extruded resin at 600 degrees Fahrenheit on polyethylene film and another film for purposes of priming those films together?